# JONATHAN MARKS, P.C.
ATTORNEYS AT LAW
220 FIFTH AVENUE
3RD FLOOR
NEW YORK, NY 10001

E-MAIL: jonmarks@msn.com

TEL: (212) 545-8008
FAX: (212) 889-3595

December 16, 2004

Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   United States v. Mohamed Al-Moayad, et. al.
>       Criminal Docket No. 03-1322 (SJ)

Dear Judge Johnson:

Defendant Mohamed Zayed ("Zayed") respectfully submits this letter-brief in opposition to the government's *in limine* motion seeking to bar him from presenting an entrapment defense to the jury. As set forth below, the government's motion is based upon a skewed version of the facts and a legal analysis that is materially at odds with the law of this Circuit. Accordingly, the government's motion should be denied.

## I.   FACTUAL BACKGROUND

In support of its motion, the government relies on Zayed's post-arrest statement to the FBI, which it summarizes in a misleading fashion, and on recordings of conversations between a Alanssi, an informant known as CI-1, and Al-Moayad and Zayed in a hotel room in Germany. Although another informant, CI-2, was present during the conversations, CI-2 had no direct conversation with the defendants since they spoke and understood only Arabic and he spoke and understood only English.

In a post-arrest interview with the FBI, "Zayed was asked why he thought he and ALMOAYAD were going to meet ALANSSI in Germany." According to an FBI report, a redacted copy of which is attached, Zayed answered that "ALMOAYAD told him that an individual wanted to provide a lot of money to ALMOAYAD's charity" and that Al-Moayad intended to receive medical treatment in Germany. Al-Moayad ran a charity center in Sana, which included a bakery for the poor, schools and an outpatient medical clinic. As reflected in the FBI report, Zayed said that it was not until he got to Germany that he learned of CI-2's interest in funneling money to terrorist organizations.

In January 2003, at Alanssi's suggestion, Al Moayad and Zayed traveled to Frankfurt. Germany. There, they met in a hotel room with Mohamed Alanssi, also known as CI-1, and CI-2, the purported American Muslim donor. The room was bugged.

The taped conversations show that Al Moayad was interested in obtaining donations from CI-2 , as shown below:

CI-1:       He [CI-2] says now we have to go into details of the Islamic work.

MOAYAD: In the name of God.

CI-1:       The details, not the five things you mentioned, but the details of the work that we will do. God willing.

MOAYAD: The first thing is the charitable bakery.

CI-1:       Do you mind him [CI-2] writing down what we talked about?

MOAYAD: Not at all, go ahead.

                              *    *    *

CI-1:       Regarding the things that he [CI-2] will be supporting.

2

\*    \*    \*

MOAYAD: The second is to take a group of young men and a group of religious scholars to teach the young men under our supervision and we pay their salaries.

\*    \*    \*

MOAYAD: The third is sponsoring students, the ones that we will teach.  Some of them are very intelligent, and want to memorize [the Quran] but they don't have enough to eat or to live.

\*    \*    \*

MOAYAD: The next point is the Muslim woman.

\*    \*    \*

MOAYAD: She needs to know her religion, and to learn a trade.

\*    \*    \*

CI-1:    He [CI-2] says that my efforts are divided into several categories, for example, if I give sheik Mohammed [Al Moayad] $500,000, here's $500,000, spend $100,000 for the bakery, $100,000 for the school, and so on.

Gov. Ex. 3, pp. 29-36.

Alanssi said that while CI-2 would make contributions to Al-Moayad's charities, he wanted Al Moayad's help in funneling money for terrorist activities.

CI-1:    He says that he doesn't mind giving you the sum of money for the bakery and such, but

ZAYED:    and we

3

CI-1:        He has other sources.

MOAYAD: He considers Jihad his cause.

CI-1:        That's it.

ZAYED:    And we'll do what we can, if we can't then [UI]

                              *    *    *

CI-1:        He says, regarding the money that he'll give you, there's a portion of it for you to spend as you see fit, that's up to you.  As for the rest, how will he know how that money will be spent?  What things will be bought?

MOAYAD: God willing, I'll organize things with our brothers in Hamas-

*Id*. pp. 41-46.

CI-1:        He says that he has 2.5 million.  He's careful that this money to be spent by your organization.

                              *    *    *

CI-1:        Second, that regarding the financial support for these things, he's willing to pay the whole amount for the Mujahidin to be trained on weaponry, explosives, bombs, all kinds of Jihad, that all this money, the majority of the money is for God's sake for these specific purposes –

MOAYAD: In that field.

CI-1:        -in that field, he want [sic] you to back that up.

MOAYAD: As much as we can possibly do.

The exchange then turns into a negotiation, with Al-Moayad and

4

Zayed bargaining for a larger share of the proceeds to go towards charity.

ZAYED:      But ask him to specify the amounts.

                        *      *      *

CI-1:       Now what percentage do you want?  Now the topic is about the available $2.500 million.

MOAYAD:  Let him make the suggestions, and we'll see.

                        *      *      *

CI-1:       He says now the percentage that you'll take for the bakery and the school that includes everything.  So the percentage is such and such percent from the total amount.

MOAYAD:  How much can we have?

                        *      *      *

CI-1:       5% of the whole amount.

ZAYED:      No.

MOAYAD:  That percentage is too small.  Make it so the total is at least 30 or 35.

CI-1:       He says 6%.

MOAYAD:  That won't work.  We need enough to meet our needs.

MOAYAD:  We want to be honest with what we do.

CI-1:       He says 10% [$250,000] is the most he can go, and that's as a start.

Gov. Ex. 4, pp. 31-34.

In sum, CI-2 induced the defendants into agreeing to assist him in funneling money to terrorist organizations by offering them $250,000 to spent as they saw fit.

### II.    THE LEGAL FRAMEWORK FOR ANALYZING THE GOVERNMENT'S MOTION

A.    The Substantive Law of Entrapment

"In their zeal to enforce the law. . . Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce the commission of the crime so that the Government may prosecute." *Jacobson v. United State*s, 503 U.S. 540, 548, 112 S.Ct. 1535, 1540 (1992).  See also *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210 (1932) (recognizing entrapment defense).

The defense of entrapment contains two elements:  (1) government inducement and (2) the lack of predisposition on the defendant's part.  Once the defense produces some credible evidence of inducement, the burden shifts to the prosecution to prove predisposition beyond a reasonable doubt. *United States v. Sale*rno, 66 F.3d 544, 547 (2d Cir. 1995).  Once inducement has been established, "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by the government agents" (emphasis supplied). *Jacobson*, *supra*, 503 U.S. at 549, 112 S.Ct. at 1540.

As for the first element, "inducement," it is settled Second Circuit law that inducement need only be established by some "credible evidence" that the government agents solicited, initiated or suggested the commission of the crime charged.  As stated in *United States v. Dun*n, 779 F.2d 157, 158 (2d Cir. 1985):

> In this circuit, `soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged' does constitute inducement, see *United States v. Sherman*, 200 F.2d 880, 883 (2d Cir. 1952) (L. Hand, J.), and there is no need to

show something more on that issue. This circuit has also consistently held that inducement refers to 'the government's initiation of the crime and not to the degree of pressure exerted.' *United States v. Riley*, 363 F.2d 955, 958 (2d Cir. 1966).

See also *United States v. Salerno*, *supra*, 66 F.3d at 549; *United States v. Duncan*, 2003 U.S. Dist. LEXIS 9301, *10 (D.Conn. Ct. 2003); *United States v. Labate*, 2001 U.S. Dist. LEXIS 6509, *25-27 (S.D.N.Y. 2001).

As for the second element, "[p]redisposition, the principal element in the defense of entrapment, *Mathews*, 485 U.S. at 63, focuses on whether a defendant is ready and willing without persuasion to commit the crime charged and awaits any propitious opportunity to do so[,] *Salerno*, 66 F.3d at 547." *Labate*, *supra*, 2001 U.S. Dist. LEXIS 6509 at 26.

B.    Procedural Considerations Pertinent To An
      *In Limine* Motion To Dismiss An Entrapment Defense

"The question of entrapment is generally one for the jury, rather than for the Court." *Mathews*, *supra*, 485 U.S. at 63, 108 S.Ct. at 886. See also *Labate*, *supra*, 2001 U.S. Dist. LEXIS 6509 at *27. Indeed, "[t]he sufficiency question may be decided on a pretrial motion only when it is clear that the evidence to be offered by the defendant can, under no interpretation, be considered sufficient to sustain his or her burden in proving the entrapment defense." *United States v. Johnson*, 32 F.3d 304, 307 (7th Cir. 1994). Given this exacting standard, the granting of an *in limine* motion barring the defense "is, of course, the exception rather than the rule." *Id.*

III.    THE GOVERNMENT'S IN LIMINE MOTION
        SHOULD BE DENIED

The government claims that the Court should preclude Zayed before trial from arguing entrapment because he has not yet established inducement by the government. For the following reasons, the government's legal and factual analysis is flawed.

A.     Errors In The Government's Legal Analysis

The government's spurious legal framework supporting its *in limine* motion is based primarily on case law from outside of this circuit, specifically *United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999). *Blassingame* involved a sting operation of corrupt public officials. In granting the government's *in limine* motion precluding the defense from referencing entrapment in its opening, the Seventh Circuit ruled that the defense had failed to meet its initial burden as to both inducement and predisposition. *Id*. at 283.

Yet, as discussed, *supra* at 280, the law in the Second Circuit is that once some credible evidence of inducement is propounded by the defense, the burden shifts to the government to demonstrate predisposition beyond a reasonable doubt (*United States v. Salerno*, *supra*).

Moreover, the *Blassingame* Court, in finding that the defense had not met its burden on inducement, considered the level of the persuasion offered (specifically whether a $4,000.00 bribe constituted an "extraordinary opportunity). As analyzed above, the law in this Circuit, under *United States v. Riely*, *supra*, *United States v. Dunn*, *supra* and their progeny is that "inducement" refers to the government's mere "initiation" of the offense. In any event, here the government offered a huge inducement: $250,000.

In sum, the government relies on authority outside of this Circuit – and contrary to the law in the Second Circuit – which: (1) shifts the burden on predisposition to the defense on an *in limine* motion, and (2) requires the defense to demonstrate persuasion and/or coercion beyond mere governmental initiation to prove inducement. The proper framework for analyzing this motion is as stated under Section II, above.

B.     The Government's Motion Is Without Factual Basis

1.     Inducement

As discussed above, "inducement" can be established merely by showing evidence of "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." Here, Alanssi, a paid government informant, initiated the transaction by proposing and initiating the meeting in Frankfurt with CI-2. But here the inducement goes far

beyond simply initiating the meeting.  The government informants offered the defendants a quarter of a million dollars if they would help CI-2 funnel money to terrorist organizations.

The government does not offer a citation in support of their claim that "[CI-1] and Al-Moayad arranged for a meeting in Germany so that Al-Moayad could meet with a wealthy American Muslim ("CI-2") *who wanted to donate a large sum of money to support terrorist organizations*" (emphasis supplied)." (Govt. Memo, 1-2).  The evidence is to the contrary.  As Zayed told the FBI and the German Police in separate interviews, he thought the purpose of their going to Germany was to meet with someone who wanted to donate money to Al-Moayad's charities.

To the extent the government plans to introduce evidence that the meeting was arranged to support terrorist organizations, Alanssi would be subject to cross-examination, and it would be for the jury to decide what if anything he had communicated to Zayed as the meeting's purpose.  But it now appears that the government may not even call Alanssi.

 The government quotes Zayed as saying "we'll do what we can" in response to hearing that the majority of funds would be used for jihad.  According to the government's draft transcript, Zayed instead said:

And we'll do what we can, if we can't then [UI]

Under the applicable standard for inducement in this Circuit, Zayed's statement certainly does not vititate the defendant's showing of inducement.  Nor does it come close to proof beyond a reasonable doubt of predisposition.

The government further argues that Zayed played a key role in the alleged conspiracy, as, *inter alia*, Al-Moayad is alleged to have stated that ". . . he's aware of everything I do, big and small." (Govt. Memo, 2-3). (citing Tr. 13-16).

In the first instance, Al-Moayad's remark is an out-of-court statement being offered for the truth, and therefore is inadmissable hearsay. Al-Moayad's statement is not an admission.  Nor is it a statement made in furtherance of the conspiracy.   The context of Al-Moayad's statement is that Zayed "will be responsible for the charitable bakery and other charity

9

work and such" (emphasis supplied).

Even if Al-Moayad's out-of-court statements are admitted into evidence, a reasonable jury could determine either that: (1) Zayed's knowledge was confined to charities, and/or (2) Al Moayad was inflating Zayed's role for the purpose of keeping the dialogue going, lest CI-2 backout of his promise to give Al-Moayad $250,000 for his charities or for any other purpose he may wish. Regardless of the interpretation of the evidence, the government's solicitation would not alter the fact that the government's initiation of the discussions and offer of $250,000 was an "inducement

Finally, the government argues that Zayed's alleged statements to FBI agents during his extradition flight negates "inducements" (Govt. Memo, 3). Yet, the government's proffer is actually exculpatory, insofar as it tends to show: (1) Zayed was not aware that the purpose of the Frankfurt meetings involved supporting "Jihad" until after he arrived in Germany, and (2) that Zayed understood that the dual purpose of the trip was to meet someone who would aid Al-Moayad's charitable endeavors, principally the bakery, and for Al-Moayad to receive medical treatment.

In sum, there is ample credible evidence of government inducement.

2.    Predisposition

Finally, the government's evidence of propensity is not uncontroverted and is, ultimately, for the jury. For the reasons discussed above, a reasonable jury could conclude, based upon the government's own proffer (Govt. Memo, 3), that Zayed traveled to Germany believing that the purpose of the trip was to raise money for charity and not terrorist activities. He learned of the plan to funnel money for terrorist activities only after the government initiated the discussions in Germany (see *Jacobson*, *supra*). After a back and forth negotiation, a sum of not less than $250,000 was settled upon (see *Blassingame*, *supra*, discussing an "extraordinary reward" in the context of predisposition analysis). Zayed never committed himself to backing CI-2's plan to finance Hamas or Al-Qaeda, as the indictment alleges.

10

## IV.   CONCLUSION

The government's *in limine* motion is frivolous.  For the reasons stated above, it should be denied in its entirety.  Zayed should be permitted to open on his entrapment defense and to present it  to the jury.  Denying Zayed the right to present an entrapment defense would violate his constitutionally protected rights to due process of law and trial by jury.

Respectfully submitted,

/s/ JMarks

Jonathan Marks

Attachment

cc:   Kelly Moore, Esq.
      Pamela Chen, Esq.
      Jeffrey Knox, Esq.
      Howard Jacobs, Esq.