

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KAM:PKC:JHK

*One Pierrepont Plaza*
*Brooklyn, New York  11201*

*Mailing Address:*   *147 Pierrepont Street*
*Brooklyn, New York  11201*

May 27, 2005

The Honorable Sterling Johnson, Jr.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Mohamed Al-Moayad, et al.
           <u>Criminal Docket No. 03-1322(SJ)</u>

Dear Judge Johnson:

    The government respectfully submits this letter in response to the defendants' motions under Rules 34 and 29 of the Federal Rules of Criminal Procedure.  Both defendants challenge the Court's jurisdiction over the three Hamas-related counts on the grounds that the government did not prove the jurisdiction element at trial, and the defendant Zayed moves for an acquittal on the two remaining counts against him on the grounds of insufficiency of the evidence.  As discussed below, the jurisdictional challenge should be rejected because (1) Rule 34 is not a proper avenue for challenging the evidence of jurisdiction offered at trial, and (2) in any event, prosecution of the defendants in the United States is fully consistent with the statute, Due Process and international law.  Zayed's Rule 29 motion should be denied because the evidence introduced at trial overwhelmingly demonstrated that Zayed conspired to support Al Qaeda (Count One) and attempted to support Al Qaeda (Count Five).

I.   <u>Jurisdictional Challenge</u>

    A.   <u>Evidence at Trial is Irrelevant to a Rule 34</u>
         <u>Jurisdictional Challenge</u>

    The defense has moved to arrest the jury's verdict under Rule 34 with respect to the three Hamas-related counts in the Superseding Indictment (the "Indictment"): conspiracy to provide material support to Hamas (Count Three), providing material support to Hamas (Count Four) and attempting to provide material support to Hamas (Count Six).  The defense does not

dispute that the Indictment properly charges jurisdiction or that the statute is constitutional.  Instead, it argues that the government did not prove jurisdiction at trial:

> Each Count of the Indictment alleged that the defendants engaged in conduct "within the Eastern District of New York and elsewhere . . . together with others . . ." to commit the offenses.  The government simply did not prove this part of its case.  The evidence adduced at trial, however, demonstrated that the conduct giving rise to the convictions occurred exclusively outside of the United States, in Germany and in Yemen.

Def. Motion, at 2.

The defense's exclusive basis for seeking a Rule 34 arrest of judgment, namely, "the evidence adduced at trial," is irrelevant to a Rule 34 motion.  The rule provides for an arrest of judgment under two scenarios: the indictment does not charge an offense; or the court does not have jurisdiction of the charged offense.  See Rule 34(a).  A court must decide the motion solely on the "record," which includes only the indictment, the plea, the verdict and the sentence.  The evidence at trial is not part of the record and therefore cannot be considered.  See, e.g., United States v. Sisson, 399 U.S. 267, 282 (1970) ("the critical requirement is that a judgment can be arrested only on the basis of error appearing on the 'face of the record,' and not on the basis of proof offered at trial"); United States v. Muyet, 994 F. Supp. 501, 524 (S.D.N.Y. 1998) ("In deciding a Rule 34 motion, a court may not look beyond the face of the record which consists of no more than the indictment, the plea, the verdict when the plea is not guilty and the sentence") (internal citations and quotations omitted); United States v. Stolon, 555 F. Supp. 238, 239 (E.D.N.Y. 1983) (same).

Here, the relevant "record" is the Indictment and the guilty verdict.  The defense does not even argue that the Indictment improperly recites the jurisdictional element.  Nor could it, as the language in the indictment tracks the language of the statute.  Count Three, for example, reads:

> On or about and between October 8, 1997 and January 10, 2003, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants Mohammed Ali Hasan Al-Moayad and

>Mohammed Mohsen Yahya Zayed, together with
>others, *within the United States and subject
>to the jurisdiction of the United States*, did
>knowingly and intentionally conspire to
>provide material support and resources . . ."

The other counts in the Indictment contain identical language.  At trial, both defendants were convicted of these counts.  The defense's sole contention is that the evidence presented at trial did not prove the jurisdictional element charged in the Indictment.  As a Rule 34 inquiry begins and ends with the "record," which does not include evidence at trial, the defense's motion should be denied.

> B.  Looking Beyond the Rule 34 Inquiry, the Evidence at Trial Clearly Established the Court's Jurisdiction Over the Hamas Counts

Even if the Court considers the evidence at trial, it should still reject the defense's challenge to the Court's jurisdiction over the Hamas-related counts (or any other counts) because the government's evidence at trial clearly satisfied the jurisdictional requirement.

> 1.  The Court Has Territorial Jurisdiction Over the Defendants' Crimes

While the defense frames the issue as whether the Court has extraterritorial jurisdiction over the defendants' conduct, extraterritoriality is not even at issue here.  Contrary to defendants' erroneous assertion that "the conduct giving rise to the convictions occurred exclusively outside the United States, in Germany and in Yemen" (Def. Motion at 2), the government, in fact, presented extensive evidence at trial showing that the defendants' material support of Hamas, and the conspiracy and attempt to do so, extended to the United States.  The defendants were caught on tape talking about the elaborate system they had in place for covertly raising money in the United States for terrorist organizations:

>CI-1: He [CI-2] is comfortable and we will
>have a final meeting where we can talk about
>the sums of money that you will take and how
>is it going to be spent.
>
>Al-Moayad: We have three ways and the last is
>best.  We have trusted Yemenis, trusted
>people, they work as money exchanges from Al

4

>Hadda. These are the banks; young men who come to us, there in Sanaa'.
>
>CI-1: And they are in the U.S.A.?
>
>Al-Moayad: They are in the U.S.A., they have an office there. Give him the money and say: 'Here is the money for the charitable bakery.' Or 'Here is the money for example for Al Moayad school. And this is one method [to send the money].
>
>CI-1: Yes.
>
>Al-Moayad: If there's something ready now, we can take it with us, that's the second way of doing things.
>
>CI-1: I believe so.
>
>Al-Moayad: The third thing, if there are things to be sent, it can be sent in Mohammed's name, or in my name, and they know what to do.

(Gov. Ex. T-4, at 56).

The "trusted Yemenis" Al Moayad was referring to include Ahmed Elfgeeh, Abad Elfgeeh and Abdul Wahab Ziad, whom the defendants used to raise money from the Al Farooq mosque in Brooklyn to support terrorist organizations. (T 1674-75, 1682; Gov. Ex. 215). The Elfgeehs sent $500 to $1,000 to Al Moayad every few weeks, and JPMorgan Chase bank records revealed that between 1995 and 2003, the Elfgeehs transmitted over $18 million from the United States to Yemen and elsewhere out of a bank account in the name of Carnival French Ice Cream, a tiny ice cream shop in Brooklyn. (T 817, 884; Gov. Ex. 113). Al Moayad assured CI-1 that the Elfgeehs could be trusted to meet with individuals who wanted to donate money for the jihad, instructing CI-1 to inform the Elfgeehs that the "matter is concerning medical treatment," a code used by Al-Moayad to refer to terrorist activity. (T 84; Ex. 14-T; T 1683). Al-Moayad admitted in post-arrest questioning that Abdul Wahab Ziad, the Imam of a mosque in Lackawanna, New York that produced the "Lackawanna Six," who were convicted in 2002 of supporting Al Qaeda, was in a position to raise money for him in the United States. (T 888). Indeed, records that the FBI recovered from

5

Ziad revealed a $1,550 transfer from Ziad to Al Moayad in December 2001. (T 1181).

       The evidence also showed that the defendants had access to Hamas representatives in the United States:

> CI-1: Of course, it's all for the Jihad for the sake of Allah.  He says the students, for example, he doesn't have the money for them to train on the computer and languages, he has for very specific training, training with Hamas, military kind of training, on weapons . . .
>
> Al-Moayad: Jihad.
>
> CI-1: Jihad with bombs, weaponry, and all types of weapons, any type of Jihad along with their learning more about Islam and educating them about Jihad for the sake of God in the language that-
>
> Al-Moayad: We will discuss this with our brothers in Hamas, of course, in order to get ready.
>
> Zayed: In order to see their circumstances, their circumstances-
>
> Al-Moayad: To see their circumstances.
>
> Zayed:  -of our brothers in America.
>
>                * * *
>
> CI-1: Later on when you contact Al Qaeda and Hamas, you can contact us and give us the names-
>
> Zayed: Yes, the cooperation will start at that time, the Mujahidins and others, providing that they will be the only participants- . . .
>
> Al-Moayad: I shall recommend some people, this recommendation will be from the Hamas person; I will ask the Hamas person, for the

name of a man whom they trust in America.  We arrange it with him to call you.

CI-1: Yes.

Al-Moayad: At that time you visit him, he calls you and together you plan, in a way that the contact is direct.

* * *

CI-1: The other thing, for example, before you travel you leave some names, so and so is in New York, which means that there are so and so in New York.  And to reassure him of the people who could get training in Hamas, these are information that he does not know.  Hence there is no need for proof because it is a proof in itself.

Zayed: We are going to have the people of Hamas visit him, and tell him-

CI-1: No, no, not visit him, but you give him [CI-2] the name and the address, and he [CI-2] will contact them the way he pleases.

Al-Moayad: We call Mohammed and tell him so and so is in this address, go see him because he is sick, please take his address, and phone number, and it is up to you to get in touch with him, to contact him or not. . .

Zayed: Do you think our friend in Hamas will agree to give them the names?

Al-Moayad: It is not going to be a problem, regarding myself, God willing, God willing- . . .

Zayed: We might go to Hamas and ask them, and he tells us, "It is not right for us to give out any names of our members."

Al-Moayad: They are well known, they had an office but the government shut it down.  The officials and experts know them there.

7

(Gov. Ex. T-5, at 35; Gov. Ex. T-6 at 14, 24)

These excerpts and other evidence presented at trial proved beyond a reasonable doubt that the defendants had access to Hamas members in the United States and experience in raising money for Hamas from the United States. The evidence also proved that the defendants' January 2003 plan in Germany to support Hamas and Al Qaeda with $2.5 million in financial contributions from the United States and through training of mujahideen sent from the United States was going to be carried out in large part in the United States. Accordingly, the court has clear territorial jurisdiction over the defendants. Although located in Yemen, the defendants did not raise, conspire and attempt to raise money for terrorist organizations exclusively from other Yemenis. They raised money from individuals in the United States, and conspired and attempted to do so. They had co-conspirators in the United States. They used the American banking system. They discussed in detail their plan to have money in the United States transferred to Yemen by hawala, couriers and through a United States bank account. In Germany, the defendants knew that the $2.5 million was coming from the United States. And when the defendants took possession of a blank check book for an account at Roslyn Savings Bank in Roslyn, New York, they expected that $2.5 million would flow through this account from New York to the defendants and, ultimately, to Hamas and Al Qaeda. (Gov. Exs. 23, T-6, at 15-22). The defendants' criminal activity was directly linked to the United States, and the Court's jurisdiction was proper.

2. Prosecution of the Defendants Comports with Due Process and Customary International Law

While conceding that Congress expressly provided for extraterritorial application of the material support statute, the defense argues that the application of Section 2339B to the defendants' conduct would be fundamentally unfair and arbitrary and thus violates Due Process. Def. Motion at 3. They are wrong.

It is well-settled that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." United States v. Yousef, 327 F.3d 56, 85 (2d Cir. 2003) (internal citations and quotations omitted). Moreover, all that is required to comport with Due Process is "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Id. at 111 (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990).

8

Here, as discussed above, the nexus is obvious on a number of levels. The conduct at issue included a conspiracy and attempt to raise $2.5 million for Hamas and Al Qaeda *from the United States*, as well as evidence of the defendants' prior terrorist financing efforts aimed at the United States. The defendants can hardly complain that prosecution by a United States court would be "arbitrary or unfair," given their decision to extend their terrorist fundraising activities to donors in the United States. The purpose of the nexus requirement is to ensure that a United States court "will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." United States v. Klimavicius-Viloriaa, 144 F.3d 1249, 1257 (9th Cir. 1998). The defendants could have reasonably anticipated being haled into a United States court when they decided to tap into the vast economic resources of the United States to facilitate terrorist organizations. As the defendants' conduct was aimed at "causing criminal acts within the United States" – including having $2.5 million and mujahideen recruits sent from the United States to support Hamas and Al Qaeda – the nexus is established. See United States v. Davis, 905 F.2d 245, 249 (9th Cir. 1990) (a sufficient nexus exists "where an attempted transaction is aimed at causing criminal acts within the United States").

The defense refers to the five "customary international law" principles in support of their Due Process argument. Contrary to their claims, however, jurisdiction here is fully consistent with the first, third and fourth bases for exercising jurisdiction under "customary international law."

Objective Territorial Principle. This principle provides for jurisdiction over conduct "that has, or is intended to have, a substantial effect within its territory," Yousef, 327 F.3d at 91 n.24. As discussed, the evidence showed that the defendants had previously raised money from the United States for terrorist organizations, and attempted to do so again. Millions of dollars being diverted from the United States to support terrorism is certainly a "substantial effect" within the United States.

Protective Principle. The protective principle provides for jurisdiction "over acts committed outside the State that harm the State's interest." Id. The defense contends that this principle does not apply because "there is no evidence that Hamas has ever attacked or planned to attack interests of the United States." Def. Motion, at 6. This argument is misguided. In enacting the material support statute, Congress explained that terrorist organizations represent a great harm to the interests

9

of the United States regardless of whether they focus their attacks on United States citizens or in United States territory:

> (1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States; . . .
>
> (4) international terrorism affects interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States; . . .
>
> (6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and
>
> (7) foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.

Pub.L. 204-132, Section 301: International Terrorist Fundraising Prohibition; Findings and Purpose.  Congress specifically contemplated the prosecution of individuals similarly situated to the defendants, i.e., those who raise money from the United States to facilitate Hamas, Al Qaeda or any other foreign terrorist organization regardless of which country's citizens are targeted by the organization.

Further, the defense's claim that there was no evidence that Hamas targets United States citizens is incorrect.  Terrorism expert Matthew Levitt testified that roughly 30 U.S. citizens have been killed in Hamas attacks and, on at least one occasion, Hamas specifically targeted a location where U.S. Embassy personnel were known to frequent:

> Q.   What is Hamas's position toward the United States?
>
> A.   Hamas is generally antagonistic because it sees the United States as an ally of Israel and supportive of Israel.

10

> Q.   Have any U.S. civilians been killed in attacks in Israel?
>
> A.   Almost 30.
>
> Q.   Has Hamas targeted locations that United States citizens are known to frequent?
>
> A.   At least one case where Hamas suicide bombers targeted Mike's Place, a bar next to the U.S. embassy in Tel Aviv which is where embassy [] personnel frequent.

(T 696).  Hamas's activities harm the interests of the United States, and thus provide for jurisdiction under the "protective principle."

<u>Passive Personality Principle</u>.  This principle "provides for jurisdiction over acts that harm a State's citizens abroad."  <u>Yousef</u>, 3278 F.3d at 91 n.24.  As noted, there was evidence at trial that 30 United States citizens have been killed as a result of Hamas attacks in Israel and that Hamas has intentionally targeted locations frequented by U.S. citizens and government personnel.  In addition, as Congress explained when enacting the material support statute, terrorist groups like Hamas "harm[] international trade and market stability, and limit[] international travel by United States citizens as well as foreign visitors to the United States."  Pub.L. 204-132, Section 301(4).  As Hamas harms United States citizens abroad, the "passive personality principle" provides the Court a basis for asserting jurisdiction over defendants who provide material support to this organization.

Accordingly, any challenge to the Court's jurisdiction over the defendants, whether under Rule 34 or any other basis, should be rejected.

## II.   <u>Zayed's Motion for Judgment of Acquittal</u>

Defendant Zayed moves for a judgment of acquittal as to Counts One and Six under Rule 29 on the grounds of insufficiency of the evidence.  This motion should be denied as well.

### A.   <u>Rule 29 Standard</u>

Rule 29, in relevant part, provides:

11

>(a)  After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction . . . .
>
>(b) The Court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

"A defendant challenging a conviction based on sufficiency grounds bears a heavy burden." United States v. Desena, 260 F.3d 150, 154 (2d Cir. 2001) (citing United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994)); see United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (defendant "shoulders 'heavy burden' in challenging sufficiency of evidence supporting conviction") (quoting Matthews); United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (defendant's burden is "very heavy").

In reviewing a conviction for an alleged insufficiency of evidence, a court must "'view the evidence in the light most favorable to the government, construe all permissible inferences in its favor, resolve all issues of credibility in favor of the jury's verdict, and uphold a conviction if any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.'" Id. (quoting United States v. Reyes, 157 F.3d 949, 955 (2d Cir. 1998)).  The court "'must determine whether, based upon all of the evidence presented at trial and 'giving full play to the right of the jury to determine credibility, weigh the evidence, and draw reasonable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (quoting United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972)); United States v. Itzkowitz, No. 96-CR-786(JG), 1998 WL 812573, at *1 (E.D.N.Y. May 13, 1998) (quoting Mariani).  If the court concludes that "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [it] must let the jury decide the matter." Taylor, 464

12

F.2d at 243 (quoting Curley v. United States, 160 F.2d 229, 232-33 (D.C. Cir. 1947)); Autuori, 212 F.3d at 114 (quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)).

Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of the witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Mariani, 725 F.2d at 865; see Autuori, 212 F.3d at 118 (trial judge is not entitled to set aside a guilty verdict simply because he would have reached a different result than the fact-finder); Guadagna, 183 F.3d at 129 (following Mariani); Strauss, 999 F.2d at 696 (jury is exclusively responsible for determining witness's credibility); United States v. Weinstein, 452 F.2d 704, 713 (2d Cir. 1971) (trial court should not direct acquittal based on its disbelief of government's witnesses). These restrictions "are necessary to avoid judicial usurpation of the jury function." Mariani, 725 F.2d at 865; Autuori, 212 at 114. Thus, a judgment of acquittal should only be entered "if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" Guadagna, 183 F.3d at 130 (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).

Here, the evidence of Zayed's membership and involvement in the conspiracy to support Al Qaeda (Count One) and his attempt to support Al Qaeda (Count Two) is direct and overwhelming. During the second day of meetings in Germany, the defendants were asked point-blank about which organizations they would support with the money. Al-Moayad, with Zayed sitting right next to him, agreed that they would use it to support both Al Qaeda and Hamas:

> CI-1: He [CI-2] says that before the day is over, God willing, he wants to finalize the matter and travel. He is also saying, of course he wants clarification on to whom the money is going to, is it going to Hamas only? Is the focus on it? Or is it going to other things, either Al Qaeda or any other organization that you deal with.
>
> Al-Moayad: The way we see it is to support all in Islam; in Jihad.
>
> CI-1: Yes.

13

> Al-Moayad: Hamas, Al Qaeda, Massajins
> [prisoners], Mujahidins, and such. Anyone
> who we know of, who is in the jihad field.

(Gov. Ex. T-5, at 12).

Immediately after this exchange, the defendants were asked why Zayed was in attendance and what his role would be. Both defendants made it clear that Zayed was Al Moayad's right-hand man, that he was aware of and involved in Al Moayad's terrorist financing activities and that he could be fully trusted to make sure that the $2.5 million would get to the intended recipients. (Gov. Ex. T-5, at 13). Moreover, in a private conversation later that evening, Zayed and Al-Moayad reiterated to each other they were bound by their commitment to spend the money as they had promised to do:

> Zayed: We gave our word.
>
> Al-Moayad: We gave the man our word. We won't go back on it.

(Gov. Ex. T-11, at 13).

The defense attempts to get around this evidence by suggesting that because it was Al-Moayad, not Zayed, who stated that the money would go to Al Qaeda, there is no evidence that Zayed agreed to support Al Qaeda. Def. Motion, at 7. This argument misconstrues both the law of conspiracy and the standard for evaluating the sufficiency of the evidence under Rule 29. As the Court instructed the jury, the government is not required to prove that Zayed said the precise words, "I agree to support Al Qaeda" in order to prove a conspiracy or an attempt. The fact of the matter is that Zayed's words and actions from the beginning of the Germany meetings until the very end prove beyond a reasonable doubt not only that he was in agreement with the plan to support both Hamas and Al Qaeda, but that he was an active participant in facilitating the agreement and that he intended to play an integral role in getting the funds to the organizations and training mujahideen after they received the money.

At no time did Zayed object to Al Moayad's promise to support Al Qaeda or suggest in any way that he did not want to take part. To the contrary, as noted, immediately after Al-Moayad promised to support Al Qaeda, both Al-Moayad and Zayed assured the informants that Zayed could also be trusted to spend the money as agreed:

14

>CI-1: That means that I can depend on you as well, by giving you [Zayed] money and it's agreed upon where that money will be spent?
>
>Al-Moayad: God willing.
>
>CI-1: God willing.
>
>Zayed: We ask God almighty to grant us success. . . And we'll do with it whatever he tells us to do.  And may God make us triumphant. . .
>
>CI-1: I ask you a question now.  Where will you use my money?
>
>Zayed: In God's hands if He is willing. . . This is on one's conscience. . . And we all should fear God, because death could come unexpectedly. . .
>
>CI-1: You'll put it where he tells you to put it, and the rest is up to God.
>
>Al-Moayad: We'll do what we can.
>
>Zayed: Of course we'll do what we can.

(T-5, 1t 16).

Moreover, far from telling Al Moayad that he did not agree that the money should go to Al Qaeda, Zayed reminded Al Moayad the next morning in a private conversation that both Hamas *and Al Qaeda* were the designated recipients:

>Al-Moayad: (UI) a portion to Hamas.  He said Hamas, I said okay to Hamas (UI).  We'll be tied to Hamas.  We'll give a sum to Hamas, with the condition that it is spent on this field.
>
>Zayed: (UI) he said Hamas, jihad, or Al Qaeda.
>
>Al-Moayad: Look, any organization, anything: Hamas, Al Qaeda, or whatever so long as it is for jihad.  So, we tell him that within the field of jihad, we have young men who are

15

>ready, but they need us to meet with them, to regain their self-confidence, and for us to help them.

(T-12, at 8). This statement by Zayed removes any doubt whatsoever about whether he understood and agreed that Al Qaeda was to be a recipient of the funds.

Accordingly, because more than ample evidence was presented at trial upon which a reasonable juror could find beyond a reasonable doubt that Zayed conspired and attempted to provide material support to Al Qaeda, the Court should reject Zayed's Rule 29 claims.

III. Conclusion

For the reasons set forth above, the defendants' motions should be denied.

Respectfully submitted,

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York

By: _____
Kelly Moore
Assistant United States Attorney
(718) 254-6465

cc: Clerk of Court (SJ)
    William Goodman, Esq.
    Jonathan Marks, Esq.