

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

August 5, 2009

<u>Via Hand Delivery</u>
The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Mohamed Al-Moayad, et al.
         <u>Criminal Docket No. 03-1322 (DLI)</u>

Dear Judge Irizarry:

      The Department of Justice and the United States Attorney's Office for the Eastern District of New York (hereinafter, "the government") respectfully submit this letter to request that the Court accept proposed plea agreements pursuant to Rule 11(c)(1)(C), attached as Exhibits A and B.  (A copy of this letter without exhibits is being provided to defense counsel and electronically filed.)  Under the agreements, the defendants will plead guilty to Count Three of the superseding indictment, charging conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).  In exchange the government will dismiss the remaining counts of the superseding indictment and the underlying indictment.  In addition, the parties will stipulate to sentences of 80 months, which is the time that the defendants have already served in custody since their arrest in Germany in January 2003.  As set forth below, this agreement is in the interests of justice for several reasons: 1) the defendants will acknowledge their guilt and plead guilty to conspiracy to provide material support to Hamas; 2) retrial in this matter may be significantly delayed in light of defendant Mohamed Al-Moayad's rapidly deteriorating health, and the pleas provide a certain and prompt resolution; 3) the pleas obviate certain evidentiary challenges resulting from the Second Circuit's decision reversing the convictions and remanding for retrial; 4) the pleas put Mohamed Zayed, the less culpable of the defendants, in the same position as Al-Moayad; and 5) the pleas address broader national security concerns.

I.   FACTUAL BACKGROUND AND PROPOSED PLEA AGREEMENT

In November 2001, Mohammed Al-Anssi, a Yemeni national, approached the Federal Bureau of Investigation ("FBI") with information about the involvement of Al-Moayad and others in providing material support to terrorists. Al-Anssi met with the FBI and explained, inter alia, that Al-Moayad, a prominent cleric in Yemen, had recruited *Mujahidin* for the *Al Qaeda*-led armed conflicts in Bosnia, Chechnya and Afghanistan. This information was later corroborated by, among other things, an *Al Qaeda* training camp form found in Afghanistan in late 2001 reflecting that Al-Moayad was the "sponsor" of one of the trainees, and pocket litter found in the possession of *Mujahidin* who had fought in Bosnia reflecting their association with Al-Moayad.

Between January and September 2002, the FBI sent Al-Anssi to Yemen three times to gather additional information and evidence regarding Al-Moayad's material support activities. During his second trip to Yemen in May 2002, at the FBI's instruction, Al-Anssi and Al-Moayad discussed the idea of Al-Moayad meeting "Saeed," an American Muslim who wanted to donate millions of dollars to support *Mujahidin* with weapons. Al-Moayad proposed meeting in Germany.

Working with Germany's federal law enforcement authority, the FBI made arrangements for Al-Anssi and a second government informant who played the role of "Saeed," a Muslim from Brooklyn, to meet with Al-Moayad and defendant Zayed, who was Al-Moayad's assistant and military bodyguard, at a Sheraton Hotel in Frankfurt, Germany in January 2003. The meetings between the defendants and informants in Germany, which took place between January 7 and 10, 2003, were captured on videotape, as were the defendants' private conversations in their hotel room. During these meetings, the defendants, inter alia, agreed to deliver approximately $2 million for Saeed to terrorist organizations, including specifically *Hamas* and *Al Qaeda*. The defendants were detained by German law enforcement on January 10, 2003, and were extradited to the United States in November 2003.

In March 2005, the defendants were convicted after a jury trial of conspiring to provide material support to *Al Qaeda* and *Hamas,* and attempting to provide material support to *Hamas*, in violation of 18 U.S.C. § 2339B. Al-Moayad alone was convicted of providing material support to *Hamas* and attempting to provide material support to *Al Qaeda*. The jury acquitted Al-Moayad of providing material support to *Al Qaeda* and acquitted Zayed of attempting to provide material support to *Al Qaeda*. Both

3

defendants received the maximum sentence: Al-Moayad was sentenced to 75 years and Zayed was sentenced to 45 years.

On October 2, 2008, the Second Circuit vacated the convictions of both defendants on all counts and remanded for retrial. United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008). The Court reversed the defendants' convictions on the basis of several evidentiary rulings by the district court, finding that the admission of certain evidence was improper and/or unduly prejudicial. The government filed a petition for rehearing en banc, which was denied on February 18, 2009.

The defendants have been incarcerated since January 2003 and have been in the custody of the United States since November 16, 2003.

Under the terms of the proposed plea agreements, the defendants will plead guilty to Count Three of the superseding indictment, charging a violation of 18 U.S.C. § 2339B(a)(1). This count carries a statutory maximum sentence of 15 years in prison, but the parties will stipulate to sentences of 80 months – i.e., time served. The defendants will also consent to their immediate removal from the United States.

II.  LAW REGARDING PLEA AGREEMENTS PURSUANT TO RULE 11(c)(1)(C)

Under Rule 11(c)(1)(C), the government and a criminal defendant may reach a plea agreement under which the defendant pleads guilty and the government, in return, "agrees that a specific sentence . . . is the appropriate disposition of the case . . . ." Fed. R. Crim. P. 11 (c)(1)(C). If the Court accepts the plea agreement, the agreed-upon sentence "binds the court . . . ." Id.

It is the law of this Circuit that Rule 11(c)(1)(C) pleas are governed by the Federal Rules of Criminal Procedure rather than the United States Sentencing Guidelines (the "Guidelines"). For example, in United States v. Cunavelis, 969 F.2d 1419, 1421-22 (2d Cir. 1992), the Court reasoned that the provisions of U.S.S.G. § 5K1.1 "are simply inapplicable to plea agreements governed by [Rule 11(c)(1)(C)]." See also United States v. Braimah, 3 F.3d 609, 611-12 (2d Cir. 1993) (describing Cunavelis as standing for the proposition that by entering into a "sentence" plea agreement pursuant to Rule 11(c)(1)(C), a "defendant effectively waives his right" to be sentenced pursuant to the Guidelines).

In <u>United States v. Williams</u>, 260 F.3d 160 (2d Cir. 2001), the Second Circuit affirmed Judge I. Leo Glasser's acceptance of a Rule 11(c)(1)(C) plea agreement that provided for a stipulated sentence considerably below the applicable Guidelines range. Judge Glasser stated during the plea allocution that although he "would normally explain what the guidelines are all about and what the estimated guidelines in this case might be," he did not do so in that case because it was "superfluous" where the defendant entered into a Rule 11(c)(1)(C) agreement. <u>Id</u>. at 163. Moreover, "Judge Glasser was not required to, and in fact did not," calculate an offense level, "was crystal clear in his belief the Guidelines were irrelevant" and ultimately "made no determination at all as to the guideline sentence that would apply in the absence of a . . . stipulated sentence." <u>Id</u>. at 172 (Haden, J, concurrence); <u>see also</u> <u>United States v. Pimentel</u>, 932 F.2d 1029, 1033-34 (2d Cir. 1991) (rejecting the notion that sentence bargains are "undue or unseemly intrusions on the judicial function" and suggesting that district courts should look favorably on Rule 11(c)(1)(C) plea agreements); <u>United States v. Aquilar</u>, 884 F. Supp. 88, 91-92 (E.D.N.Y. 1995) (noting that pursuant to Rule 11(c)(1)(C), "a large class of defendants may be sentenced outside the Guidelines.").

"Moreover, if there was any doubt whether a court may impose a sentence outside of the Sentencing Guidelines range" pursuant to a Rule 11(c)(1)(C) plea agreement, "that doubt has been erased by the Supreme Court's recent decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005)." <u>United States v. Cieslowski</u>, 410 F.3d 353, 363 (7th Cir. 2005); <u>see also</u> <u>United States v. Kling</u>, 516 F.3d 702, 704 (8th Cir. 2008) (en banc) (holding that "Rule 11(c)(1)(C) plea agreements remain permissible post-<u>Booker</u>"); <u>United States v. Bundy</u>, 359 F. Supp.2d 535, 538 (W.D.Va. 2005) ("After <u>Booker</u>, of course, there can be no reasonable argument that the court does not have the authority to accept an agreed sentence below the guideline range"). Indeed, "<u>Booker</u> actually strengthens the case for the validity of sentences imposed under Rule 11(c)(1)(C) plea agreements that deviate from the Guidelines range." <u>Cieslowski</u>, 410 F.3d at 363.

Even though they operate totally outside the Guidelines, Rule 11(c)(1)(C) pleas are nonetheless consistent with larger sentencing goals and objectives. The Guidelines provide that district courts can accept such agreements if "the agreed sentence departs from the applicable guideline range for justifiable reasons" and do not "undermine the basic purposes of sentencing." U.S.S.G. § 6B1.2(c). As Judge John Gleeson has written, since "the phrase 'justifiable reasons' can easily

accommodate all of the real-world factors that cause prosecutors and defense counsel to strike sentence bargains," and because "those concerns [have] long been considered legitimate reasons for courts to accept sentence bargains, it [is] easy to conclude that accepting these agreements [does] not 'undermine' any purpose of sentencing, let alone the 'basic' ones." John Gleeson, The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains, 36 Hofstra L. Rev. 639, 644 (2008).

In his article, Judge Gleeson elaborated, citing an example from his own courtroom experiences:

> [T]he very same reasons that we grant [prosecutors] the power to decline to prosecute--their expertise in assessing the strength of a case, their interest in best allocating their resources, and their superior ability to weigh the crime control implications of their actions--counsel in favor of allowing prosecutors to bargain for lesser sentences. Here's an example from my own experience as a prosecutor: A decision to strike a seven-year sentence bargain with a seventy-year old mobster charged with murder. That bargain reflected a considered judgment about the risk that defendant posed to the community at the time, the risk he would pose when released after such a sentence, and the likelihood that a jury would convict based on the evidence I knew would be presented. Similarly, a sentence bargain that would fend off a long money laundering trial could easily reflect a decision to staff a wiretap with agents who otherwise would be tied up in that trial. These are important crime control and resource allocation decisions, and they are exactly the kinds of decisions we want our prosecutors to make . . . Just like the decision whether or not to charge, the decision what sentence to pursue in plea negotiations is a crime control judgment that prosecutors are best situated to make.

Gleeson, supra, at 655-57 (internal citations omitted).

This pragmatic analysis of the utility of such an agreement is particularly applicable in the national security

6

context, where complex balancing is performed by federal prosecutors in evaluating national security interests during the course of its criminal prosecutions, a unique function of the executive branch.

III. JUSTIFICATION FOR THE PROPOSED PLEA AGREEMENTS

The proposed plea agreements pursuant to Rule 11(c)(1)(C) constitute a just and justifiable resolution of this case because of the uncertainty related to the start of a new trial as a result of Al-Moayad's deteriorating health condition, increased litigation risks as a result of the Second Circuit's decision reversing the district court's admission of several important items of evidence, the need to ensure that the less culpable defendant does not face more time than the more culpable defendant and broader national security considerations.

Al-Moayad's significant health issues may delay retrial in this matter indefinitely. This is a significant consideration for the government given that six years have elapsed from the criminal activity in this matter. Al-Moayad is 60 years old. Since his arrest in January 2003, his health has seriously and substantially deteriorated as a result of several serious, chronic medical conditions. Al-Moayad suffers from, among other ailments: cirrhosis of the liver; Hepatitis C; portal hypertension; esophageal varices (bleeding); diabetes; severe anemia; and leukopenia (a deficiency in low white blood cells). In particular, the condition of Al-Moayad's liver significantly compromises his life expectancy – which has been estimated at a few months to a few years – and the esophageal varices, if not responsive to medication, could result in severe bleeding and death. These conditions often require that Al-Moayad be hospitalized for significant periods of time for medical procedures such as blood transfusions. Although management of these conditions is possible for a period of time while the defendant is incarcerated, Al-Moayad's long-term prognosis under current conditions is poor.

While, in an ordinary case, a defendant's health condition would likely not be a valid basis for a lenient sentence when the defendant has committed such serious crimes, this case is extraordinary. First, despite the best efforts of Bureau of Prisons medical staff, there is a significant possibility that Al-Moayad will be too ill to stand trial. Given the international importance of this case and the fact that more than five years has elapsed since the defendants were extradited to the United States to face charges, the government feels strongly that a prompt and final resolution of this matter – in

which the defendants acknowledge their guilt and are removed to Yemen – is in the interests of justice.

Second, as discussed, the Second Circuit reversed the convictions of Al-Moayad and Zayed on the basis of several evidentiary rulings by the district court, finding that the admission of certain evidence was improper. While the government continues to have a strong case against the defendants, the Court's decision increases the burden on the government to prove the defendants' "knowledge" that *Hamas* and *Al Qaeda* engage in terrorism, a necessary element under the material support statute. Moreover, much of the excluded evidence is relevant to prove the defendants' predisposition to support *Hamas* and *Al Qaeda*, which the government was required to do in the first trial because the defendants asserted entrapment defenses. If the defendants assert entrapment again – and we expect they will – proving predisposition will be more difficult at a second trial.

With respect to defendant Mohamed Zayed, the government further believes that Zayed, who participated in the charged crimes solely as Al-Moayad's assistant, should receive the same sentence as Al-Moayad.

Finally, the proposed resolution addresses broader national security implications.

IV.   CONCLUSION

The government has carefully considered whether the terms of these plea agreements satisfy the ends of justice and provide a fair a just resolution to this matter. In evaluating all the factors enumerated in this letter and weighing this case as a whole, the government has concluded that this is a fair and just resolution to this matter. Accordingly, for all of the reasons set forth in this letter, the government respectfully

8

requests that the Court accept the proposed Rule 11(c)(1)(C) plea agreements in the above-captioned case.

        Respectfully submitted,

        BENTON J. CAMPBELL
        United States Attorney


By:       /s/
     Jeffrey H. Knox
     Pamela K. Chen
     Assistant U.S. Attorneys


     DAVID S. KRIS
     Assistant Attorney General
     National Security Division


By:      /s/
     Michael Mullaney
     Chief
     Counterterrorism Section
     National Security Division